UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel.* JAMES WHITE, and | : | |
| STATE OF RHODE ISLAND *ex rel.* | : | C.A. No.:_____ |
| JAMES WHITE, | : | |
| Plaintiffs | : | **FILED IN CAMERA AND** |
| | : | **UNDER SEAL[1]** |
| vs. | : | |
| | : | **JURY TRIAL DEMANDED** |
| BARLETTA HEAVY DIVISION, INC., | : | |
| and 6/10 CONSTRUCTORS JOINT | : | |
| VENTURE, O & G INDUSTRIES, INC., | : | |
| D.W. WHITE CONSTRUCTION, INC., | : | |
| and AETNA BRIDGE CO., | : | |
| Defendants | : | |

## COMPLAINT

This is an action against defendants Barletta Heavy Division, Inc. ("Barletta

Heavy") and 6/10 Constructors Joint Venture ("6/10 Constructors"), O & G Industries,

Inc. ("O&G"), D.W. White Construction, Inc. ("DW White"), and Aetna Bridge Co.

("Aetna Bridge") to recover treble damages, civil penalties, attorney fees, and costs

under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("Federal FCA"), and under

Rhode Island's False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.* ("RI FCA"), for

submitting false or fraudulent claims for payment, and fraudulent supporting

---

[1] Relator James White files this Complaint under seal, as required by the federal False Claims Act, *see* 31 U.S.C. § 3730(b)(2), and the Rhode Island False Claims Act, *see* R.I. Gen. Laws § 9-1.1-4(b)(2). In light of these statutory requirements to file this *qui tam* Complaint under seal, Mr. White is not required to file a separate motion to seal. *See* LR Gen. 102(b)(4) ("Parties do not need to file a separate motion to seal for pleadings or documents filed in cases that are sealed pursuant to statute," and "[s]ealed cases would include … *qui tam* actions"). Mr. White has nevertheless filed, along with this Complaint, an *Ex Parte* Motion to File *Qui Tam* Complaint Under Seal, asking that the Court allow this Complaint to be filed under seal as statutorily required.

statements and documentation to the State of Rhode Island's Department of Transportation ("RIDOT") in connection with two construction projects: a project known as the Route 6/10 Interchange Reconstruction Project ("6/10 Project"); and a project known as the Pawtucket/Central Falls Commuter Rail Station & Bus Hub ("Pawtucket Project").

1.      Relator James White is a resident of Glocester, Rhode Island.

2.      Defendant Barletta Heavy is a Massachusetts corporation registered to do business in Rhode Island, and has a principal office located at 40 Shawmut Road, Suite 200, Canton, Massachusetts.  RIDOT awarded Barletta Heavy the contract for the Pawtucket Project ("Pawtucket Contract").

3.      Defendant 6/10 Constructors is, on information and belief, a group of contractors comprised of Defendants Barletta Heavy, O&G, DW White, and Aetna Bridge (collectively, "6/10 Constructors").  RIDOT awarded the contract for the 6/10 Project ("6/10 Contract") to 6/10 Constructors.

4.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because it is brought under the Federal FCA.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

5.      Venue lies in this district under 28 U.S.C. §§ 1391(b) and (c), and under 31 U.S.C. § 3732(a) because the Defendants, or any one of them, can be found, resides, or transacts business in this district, and/or committed acts in violation of 31 U.S.C. § 3729 in this district.

**The 6/10 Project**

6.      The 6/10 Project is located at and around the interchange of State Route 6 West and State Route 10 North, in the Olneyville neighborhood on the west side of the city of Providence.  Olneyville is home to a high number of low-income residents and residents of color.

7.      According to RIDOT's web site, the 6/10 Project involves "reconstructing the entire interchange within the existing highway right of way, while replacing or removing the seven structurally deficient bridges within the project area."  *See* http://www.dot.ri.gov/projects/610/index.php, visited 1/15/21.

8.      According to RIDOT's web site, the 6/10 Project commenced in 2018, has an anticipated completion date of 2023, carries a total projected cost of $410 million, and is the largest single public construction contract ever awarded in Rhode Island.  *See* http://www.dot.ri.gov/projects/projects_metropolitan_providence.php (under "Project Summary List," "6/10 Interchange Reconstruction"), visited 1/15/21.

9.      The 6/10 Project encompasses a sizable area, and is located directly next to residences and businesses, with a number of schools located next to or near the 6/10 Project site.

10.      Given the residences, businesses, and schools located near or directly next to the 6/10 Project, one of RIDOT's concerns is ensuring that environmental contamination is kept to a minimum.

11.      According to a "Fact Sheet" dated June 2018 and posted on RIDOT's web site, contaminated soils are a major concern at the 6/10 Project:

3

The lowering of Route 10 Southbound and under construction activities will require excavating and managing a large amount of soil. Because the highway corridor is located in an urban area where industrial activities have been performed for over 100 years, there are environmental impacts in the area related to industry, motor vehicle traffic, and fill material placed in the corridor in the 1950s when the existing Route 6/10 Interchange was constructed. These environmental impacts will affect how and where the excavated soil is treated and disposed.

Environmental studies were completed to help plan appropriate methods for managing excavated soil during the construction project. Soil samples were collected to investigate soil quality throughout the construction site.

The soil sampling results were typical of urban soils. Constituents typical of gasoline, motor oil, and asphalt pavement or coal were detected in a number of locations, including total petroleum hydrocarbons, polycyclic aromatic hydrocarbons, and lead concentrations above RI Department of Environmental Management (RIDEM) Direct Exposure Criteria (DEC). In isolated areas, soil was found to contain arsenic and beryllium at concentrations above DEC.

**Soil Management Plan**

Based on the results of the environmental studies, soil excavated during construction will be segregated into clean material, dirty material that will be disposed off-site, and material that is appropriate for reuse under the highway. Segregated soil will be stored in temporary stockpiles on fenced properties and covered pending reuse or shipment off-site.

*See* http://www.dot.ri.gov/projects/610/docs/6-10_Fact_Sheet_English.pdf, visited 1/15/21.

12. The Fact Sheet shows that, as early as June 2018, RIDOT was concerned about contaminated soils at the 6/10 Project, and planned to have "dirty material" – *i.e.*, contaminated soils – removed from the Project and disposed of off-site.

13.    In or around 2018, RIDOT awarded the 6/10 Contract to the group known as 6/10 Constructors.

14.    The 6/10 Contract requires, among other things, that soils be brought to the 6/10 Project site to be used as fill material.

15.    As required by the 6/10 Contract, Defendants have on numerous occasions brought soils to the 6/10 Project site for use in the construction.

16.    The 6/10 Contract requires that these soils be sufficiently free from contamination to be used at the 6/10 Project, and a permit for the 6/10 Project issued by the Rhode Island Department of Environmental Management ("RIDEM") requires that soils brought to and incorporated in the 6/10 Project work be within the limits of RIDEM's Residential Direct Exposure Criteria ("RDEC").  The Contract does not permit the use of soils containing levels of contamination that exceed the RDEC.

**The Pawtucket Project**

17.    The Pawtucket Project is located in the City of Pawtucket, near its border with the City of Central Falls.  According to RIDOT's web site, the Pawtucket Project is located in an area with a 20-30% poverty level and 33% minority population.  *See* http://www.dot.ri.gov/projects/PCF/, visited 1/15/21.

18.    According to RIDOT, the Pawtucket Project involves the construction of an intermodal transit center that will allow riders to switch modes easily between the commuter rail service provided by the Massachusetts Bay Transportation Authority ("MBTA"), and the statewide bus service provided by the Rhode Island Transit Authority ("RIPTA").  *See*

http://www.dot.ri.gov/projects/projects_northern_rhode_island.php, visited 1/15/21.

19.     As with the 6/10 Project, contaminated soils are a concern at the Pawtucket Project.  According to a Site-Specific Hazardous Materials Health & Safety Plan created by Beta Group, Inc. ("Beta") for the Pawtucket Project, a Phase II Environmental Site Assessment analyzing soil samples from the Pawtucket Project revealed:

- Detectible arsenic concentrations exceeding RIDEM's RDEC in 17 of 30 samples;

- Other metals including barium, cadmium, chromium, lead, mercury, selenium, and zinc were reported in some samples;

- Polycyclic aromatic hydrocarbons, or PAHs, typically chrysene and/or benzo(a)pyrene, were detected in levels exceeding the RDEC in 16 of 30 samples;

- Pesticide concentrations were detected in five samples; and,

- Contaminated soils pose a risk to workers at the Pawtucket Project, especially the ingestion of total petroleum hydrocarbons ("TPHs"), PAHs, and arsenic.

20.     Indeed, the Pawtucket Contract required that individuals operating heavy machinery to move soils and other materials at the Pawtucket Project site were required to have completed a 40-hour OSHA training known as Hazardous Waste Operations and Emergency Response, or HAZWOPER.  OSHA has issued HAZWOPER standards, codified at 29 C.F.R. 1910.120 and 29 C.F.R. 1926.65.  HAZWOPER was developed by OSHA as required under the Superfund Amendments Reauthorization Act of 1986, which required that OSHA issue regulations protecting workers engaged in emergency hazardous waste operations.  The fact that such training was required for the Pawtucket Project further evidences Barletta Heavy's knowledge that soils at the Pawtucket Project were heavily contaminated.

21.     RIDOT awarded the Pawtucket Contract to Barletta Heavy.

22.     The Pawtucket Contract, and a permit issued for the Pawtucket Project by RIDEM, required that contaminated soils from the Pawtucket Project be removed from the Pawtucket Project site and disposed of at a licensed disposal facility.

### Barletta Heavy Projects In Massachusetts

23.     As part of the 6/10 Project, Defendants proposed using as fill certain soils and other material which Defendants would bring to the 6/10 Project site from Massachusetts.  Specifically, Defendants proposed importing soils and other fill material from an area located along the commuter rail line operated by the MBTA between the Maverick and Airport stops in or near Boston, Massachusetts, and stockpiled at the MBTA's Orient Point station (the "Orient Point Soils").

24.     As part of its effort to convince RIDOT and RIDEM to allow it to utilize the Orient Point Soils at the 6/10 Project, Defendants presented RIDOT with a report dated July 7, 2020 prepared by Mabbett & Associates, Inc. ("Mabbett Report").  The Mabbett Report includes a discussion of the Orient Point Soils, as well as results of environmental testing performed on the Orient Point Soils to detect contamination.

25.     The Mabbett Report concluded, among other things, that the Orient Point Soils did "not contain or [are] not [themselves] a listed or characteristic hazardous waste."

26.     On information and belief, after receiving the Mabbett Report from Defendants, RIDOT and RIDEM approved Defendants' proposal to use Orient Point Soils at the 6/10 Project.  Despite this, Defendants brought soils to the 6/10 Project that,

on information and belief, did not come from the Orient Heights station and instead originated from one or more of a number of projects that Barletta Heavy was working on, located in or near Jamaica Plain, Massachusetts.

27.    Specifically, Barletta Heavy has been performing work in the City of Jamaica Plain, Massachusetts since at least 2015.

28.    Projects on which Barletta Heavy has worked in Jamaica Plain include (1) upgrading the train signal system at the MBTA's Forest Hills commuter rail station, (2) renovating the Forest Hills busway, and (3) removing the Casey overpass and reconstructing the nearby roadway (collectively, the "Jamaica Plain Projects").  On information and belief, each of the Jamaica Plain Projects involved the disturbance, removal, and stockpiling of soils from each of those projects.

29.    On information and belief, Barletta Heavy stockpiled at least some of the soils from one or more of the Jamaica Plain Projects at the Forest Hills MBTA station ("Forest Hills Soils").

**Defendants' Fraudulent Scheme**

30.    As explained above, the Pawtucket Contract required that Barletta Heavy remove contaminated soil from the Pawtucket Project site and dispose of it at a licensed disposal facility.  Meanwhile, the 6/10 Contract required that Defendants, including Barletta Heavy, bring to the 6/10 Project Site and incorporate into that work soils that are sufficiently free of contamination and do not exceed RIDEM's RDEC.  Moreover, RIDOT and RIDEM, based at least in part on the Mabbett Report provided by Barletta Heavy, agreed to allow Defendants to import to and use on the 6/10 Project the Orient

Heights Soils.

31.     Defendants ignored these clear contractual and permit requirements, and instead engaged in a fraudulent scheme whereby (1) soils from the Pawtucket Project containing contaminants in excess of RIDEM's RDEC were not brought to a licensed disposal facility, but were instead brought to the 6/10 Project to be incorporated into the 6/10 Project work, and (2) Defendants represented to RIDOT that fill brought from Massachusetts was Orient Heights Soils, when the soils were actually heavily contaminated Forest Hills Soils.  These soils brought to and used in the 6/10 Project contained contamination in amounts exceeding the limits set by the 6/10 Contract and applicable RIDEM Permits.

32.     In furtherance of Defendants' fraudulent scheme, on information and belief, Defendants submitted to RIDOT false or fraudulent invoices or other demands for payment, as well as fraudulent supporting documents and statements, seeking payment for the delivery and use of soils and other fill material at the 6/10 Project that were sufficiently free from contamination under the 6/10 Contract and applicable RIDEM permits, despite Defendants knowing that the Pawtucket Project soils and the Forest Hills Soils that Defendants actually delivered and used at the 6/10 Project contained contamination in excess of what was allowed under the 6/10 Contract and applicable RIDEM permits.

33.     Meanwhile, on the Pawtucket Project, on information and belief, Barletta Heavy submitted to RIDOT false or fraudulent claims for payment, as well as fraudulent supporting documents and statements, seeking payment for removing

contaminated soils and disposing of those soils at a licensed facility as required by the Pawtucket Contract, despite Barletta Heavy knowing that those soils were not disposed of at a licensed facility, and were instead brought to and incorporated into the 6/10 Project.

34.     Further regarding the 6/10 Project, on information and belief, Defendants submitted to RIDOT false or fraudulent invoices or other demands for payment, as well as supporting documents and statements, stating that soils brought to the 6/10 Project from Massachusetts were Orient Heights Soils from the Orient Heights MBTA station, despite knowing that those soils were heavily contaminated Forest Hills Soils from the Forest Hills MBTA station.

**Relator James White's Role As The Original Source Of The Information Exposing Defendants' Fraudulent Scheme**

35.     Relator James White is the Business Manager and President of the International Union of Operating Engineers ("IUOE"), Local 57 (the "Union"). IUOE is a diversified trade union that primarily represents operating engineers (who operate heavy equipment), mechanics, and surveyors in the construction industry, as well as stationary engineers (who work in operations and maintenance in building and industrial complexes). IUOE represents over 400,000 working men and women in the United States and Canada.

36.     As Business Manager and President of the Union, Mr. White receives feedback from Union members regarding the construction projects on which they work, and the working conditions at those projects.

37.    Union members have worked and continue to work on the 6/10 Project and the Pawtucket Project.  Those Union members have, among other things, operated heavy machinery involved in the extraction, handling, and removal of the contaminated soils at those projects.

38.    On or around July 17, 2020, Mr. White began receiving complaints from Union members regarding soils being brought to the 6/10 Project, and the dust those soils were generating throughout the job site.  Among other things, a Union member with the 40-hour HAZWOPER training who worked at the 6/10 Project complained to Mr. White that soils were being delivered to the 6/10 Project that were dark in appearance, had a chemical-like smell, and contained a mixture of railroad nails and spikes, as well as railroad ballast (*i.e.*, the rocks on which train track is laid).

39.    Fearing that Union members might be exposed to harmful contamination from the soils and dust, Mr. White immediately directed a Union representative to inform Defendants that potentially hazardous soils and other materials were being delivered to the 6/10 Project.  The Union representative did so, and also made a request to Barletta Heavy's Dennis Ferreira that Defendants provide a water truck to the 6/10 Project site to spray the soils and suppress the dust.  While Mr. Ferreira did not promptly respond to that request, a water truck was eventually sent to the site, but without a driver.  Mr. Ferreira ended up operating the water truck to try and suppress dust at the 6/10 Project, but only operated the water truck once per day, which was insufficient to suppress dust throughout the day at the 6/10 Project site.

40.    Mr. White then began investigating the complaints and discovered a

serious and ongoing fraud being perpetrated by the Defendants against both the United States and the State of Rhode Island.

41.    As one example of Defendants' fraudulent scheme, Mr. White discovered that soils and other materials that were being delivered to and used at the 6/10 Project were taken from the Pawtucket Project, where other Union members were working. Mr. White knew that the Pawtucket Project involved the removal of highly contaminated soils and other materials, giving rise to fears that his Union members were being exposed to toxic soils and other materials, and their resulting dust, at the 6/10 Project.

42.    On or around July 18, 2020, Mr. White received photographs from a Union member showing a dump truck with "JB Trucking, LLC  Plymouth, MA  USDOT 2868264" printed on its doors, that had picked up soils and other materials from the Pawtucket Project and dumped it in an unprotected pile at the 6/10 Project.  Mr. White learned that during an approximate two-week period in or around late July and August 2020, numerous dump trucks made numerous daily trips carrying soils from the Pawtucket Project to the 6/10 Project.  During the first week, there were two dump trucks making between 7 and 10 trips per day transporting Pawtucket Project soils to the 6/10 Project.  During the second week, there were three or four dump trucks making between 7 and 10 trips per day transporting Pawtucket Project soils to the 6/10 Project.  On information and belief, Defendants hired these dump trucks using a so-called mobile phone application, or "app," that allows users to hire dump trucks for specific tasks.

43.     On or around July 21, 2020, at Mr. White's direction, Steve Rogers, a Union business agent, telephoned RIDEM and made a complaint regarding the apparently contaminated soils at the 6/10 Project.

44.     In an apparent effort to assuage the concerns of Mr. White and the Union members working at the 6/10 Project, Defendants informed Mr. White that soils brought to the 6/10 Project from Massachusetts came from a stockpile at the Orient Heights MBTA station – in other words, that the soils being brought to the 6/10 Project from Massachusetts were Orient Heights Soils.  Barletta Heavy also provided Mr. White with the Mabbett Report, and told him that the Mabbett Report – which concerns the Orient Heights Soils, not the Forest Hills Soils – established that the soil being brought to the 6/10 Project was sufficiently free from contamination so as to pose no risk to those working on the 6/10 Project.

45.     The Mabbett Report, however, stated that the Orient Heights Soils would be brought to a facility in Saugus, Massachusetts – not to the 6/10 Project site.  Indeed, the subject line of the Mabbett Report states: "Re:  Request for Approval of Soil Reuse at Aggregate Industries, Saugus, Massachusetts, Orient Heights Station Material Stockpile, Boston, Massachusetts," and the Mabbett Report is addressed to an individual at Aggregate Industries located in Saugus.  It was therefore unclear to Mr. White whether Orient Heights Soils were in fact being brought to the 6/10 Project or, as stated in the Mabbett Report, to the Aggregate Industries facility in Saugus.  Adding to the confusion, the Mabbett Report concerned the transport of only 400 cubic yards of soils, but it appeared to Mr. White that Defendants had brought more than 400 cubic yards of

soils to the 6/10 Project site from Massachusetts.

46.    Due to this uncertainty, on or about July 22, 2020, Mr. White directed Mr. Rogers to follow dump trucks that were bringing soils to the 6/10 Project from Massachusetts, to confirm whether the soils being brought to the 6/10 Project were in fact Orient Heights Soils taken from the stockpile at the Orient Heights MBTA station.

47.    As yet another example of the Defendants' fraudulent scheme, Mr. White learned from Mr. Rogers that, contrary to Defendants' statements, the soils being brought to the 6/10 Project were not Orient Heights Soils taken from the stockpile at the Orient Heights station, and were instead Forest Hills Soils taken from a stockpile at the Forest Hills station.  In other words, Defendants were bringing Forest Hills Soils to the 6/10 Project, despite telling Mr. White and RIDOT that the soils were Orient Heights Soils taken from the Orient Heights station, and despite providing Mr. White and RIDOT with the Mabbett Report and telling both that the soils discussed in the Mabbett Report – *i.e.*, Orient Point Soils – were the soils being brought to the 6/10 Project.

48.    On July 22, 2020, Mr. Rogers witnessed two so-called trailer dump trucks (which have larger beds and can transport more soils as compared with a typical dump truck) being loaded with Forest Hills Soils at the Forest Hills MBTA station, then followed those trucks to the 6/10 Project site, where both dumped the Forest Hills Soils in an unprotected pile.  One of the trucks had "JB Trucking LLC, Plymouth, MA USDOT 2868264" printed on its doors.  The other had "Briden Leasing Inc., MC 411604 US DOT 969234" printed on its doors.  Mr. White subsequently learned that these two trailer dump trucks each made up to three trips per day carrying Forest Hills Soils to

the 6/10 Project and dumping them in unprotected piles there for approximately two weeks.

49.      On or about July 22, 2020, Mr. Rogers received a text message from Rachel Simpson of RIDEM, in which Ms. Simpson suggested that Mr. Rogers contact Dave Chopy of RIDEM to discuss his complaint.  That same day, Mr. Rogers, acting at Mr. White's direction, called Mr. Chopy from RIDEM and left him a voicemail regarding his complaint.

50.      Also on or about July 22, 2020, Mr. Rogers, at Mr. White's direction and with Mr. White present, called the Rhode Island State Police ("RISP") and lodged a complaint with RISP regarding contamination in the 6/10 Project soils.  Mr. Rogers spoke with RISP Corporal Gina Lindell.

51.      On or about July 23, 2020, Mr. Rogers, at Mr. White's direction and with Mr. White present, called the United States Environmental Protection Agency ("EPA") and lodged a complaint with EPA regarding the 6/10 Project soils.  Mr. White spoke with EPA's Kevin Williams, who assigned Incident Report # 1282633.

52.      Also on or about July 23, 2020, Mr. Rogers, at Mr. White's direction, called the Massachusetts Department of Environmental Protection ("MDEP") and lodged a complaint with MDEP regarding the Forest Hills Soils being trucked to and used at the 6/10 Project site.  Mr. White spoke with MDEP's Ken Sanderson.

53.      In all of these communications and in follow-up communications, Mr. White, or Mr. Rogers acting at Mr. White's direction, voluntarily disclosed to RIDEM, RISP, EPA, and MDEP all of the information alleged above regarding Defendants'

fraudulent scheme. On information and belief, RIDEM, RISP, EPA, and MDEP were not aware of Defendants' fraud, and learned of it for the first time through these voluntary disclosures.

54. On or about August 5, 2020, Mr. White wrote to Peter Alviti, the Director of RIDOT, and notified Director Alviti of the complaints Mr. White had received regarding contaminated soils at the 6/10 Project. Mr. White further informed Director Alviti (1) that Mr. White's investigation revealed that soils being brought to the 6/10 Project were coming from the Forest Hills station, and that upon delivery of those soils to the 6/10 Project, Union members were being directed to "immediately mix this fill into the native soils as soon as it is dumped out of the trucks," (2) that, following Mr. Alviti making certain statements regarding contamination in the 6/10 Project soils during a recent interview on a local radio talk show, Mr. White had received numerous inquiries regarding the matter, including demands from Union members and their spouses that he further investigate to determine if the Forest Hills Soils were hazardous, and (3) that Mr. White had collected samples of the soils being brought to the 6/10 Project and submitted them for testing. Mr. White promised to provide Director Alviti with the results of the testing. Mr. White provided all of this information to Director Alviti voluntarily.

55. Director Alviti at first offered no response to Mr. White. Instead, on or about August 13, 2020, Mr. White spoke by phone with David Walsh and James McGuinn of RIDOT. During that call, Mr. White told Messrs. Walsh and McGuinn that he would be providing RIDOT with additional information regarding the soils being

brought to the 6/10 Project.

56.     Incredibly, despite the seriousness of the information disclosed in Mr.

White August 5 letter, Director Alviti did not respond until August 18, 2020.

Specifically, Director Alviti, in a letter to Mr. White dated August 18, 2020, claimed that,

prior to receiving Mr. White's letter, RIDOT had requested "the analytical testing report

used to classify the soil material in question from the contractor," and that upon

receiving that report, "RIDOT forwarded it to [RIDEM] for further analysis."  Director

Alviti stated that RIDEM reviewed the report "and has concluded that 'everything was

below Residential Direct Exposure Criteria in accordance with the remediation

regulations and can be used on-site.'"  Mr. White believes that the report to which

Director Alviti was referring was the Mabbett Report, which exclusively concerned

Orient Heights Soils, and not the Forest Hills Soils that Defendants were bringing to the

6/10 Project.

57.     On or about August 31, 2020, Mr. White – who had samples of Forest Hills

Soils and Pawtucket Project soils brought to the 6/10 Project sent to R.I. Analytical

Laboratories, Inc. ("RI Analytical"), an independent lab, for analysis – received the

results of the soils analysis.  The testing results showed that those Forest Hills Soils

contained two hazardous contaminants in amounts that exceeded the RDEC –

dibenzo(a,h)anthracene and benzo(a)pyrene.

58.     On or about August 31, 2020, Mr. White hand-delivered the results to

Director Alviti's office, along with a cover letter dated August 31, 2020, in which Mr.

White wrote, regarding dibenzo(a,h)anthracene, that it "'is highly genotoxic and it

intercalates into DNA and causes mutations.' (Genotoxic agents are mutagenic or carcinogenic when inhaled, ingested or penetrate the skin)." Regarding benzo(a)pyrene, Mr. White wrote that it is "'mutagenic and highly carcinogenic.' (cancer causing and changes the genetic material of DNA)[.]"

59.    Mr. White further informed Director Alviti that "[c]onservatively, in excess of 4000 tons of this hazardous material has been trucked into Rhode Island for this project. … I am requesting that RIDOT take the appropriate steps to mitigate the effects of this materials, either by having the contractor remove all of the material or declare the project a hazardous waste site and treat it as such."

60.    Also on August 31, 2020, Mr. White hand-delivered the soils testing results, as well as a copy of his letter to Director Alviti, to the office of RIDEM Director Janet Coit. In his cover letter to Director Coit enclosing those materials, Mr. White noted that "[i]t is shocking to think that the State of Rhode Island would allow thousands of tons of hazardous waste to be trucked in from Massachusetts and dumped in the middle of Providence for use on a construction project. This hazardous waste is being buried in close proximity to businesses, homes and a school."

61.    On or about September 4, 2020, after RIDOT had taken no apparent action in response to Mr. White's disclosures, Mr. White traveled to the RISP's Hope Valley Barracks and provided a statement to RISP Lieutenant Mike Casey, in which Mr. White voluntarily provided Lieutenant Casey with all of his knowledge regarding Defendants' fraud.

62.    Later on or about September 4, 2020, Mr. White met Lieutenant Casey at

the 6/10 Project site.  During that meeting, Lieutenant Casey took samples of soils, purportedly for testing.  Lieutenant Casey took the samples from two piles of soil dumped by a Union member, with one pile comprised of Forest Hills Soils, and the other comprised of Pawtucket Project soils.  The Union member who dumped these soils had not mixed them with soils from the 6/10 Project at the time Lieutenant Casey sampled them.

63.     However, on September 5, 2020, Mr. White learned that Lieutenant Casey had been directed to cease communicating with Mr. White, and that, if Lieutenant Casey did communication with Mr. White, Lieutenant Casey would be subject to discipline for insubordination.

64.     On or about September 6, 2020, Mr. White was contacted by a reporter for GoLocalProv.com, regarding the situation at the 6/10 Project.  Mr. White provided the reporter with information that was published by GoLocalProv.com on September 7, 2020.

65.     On or about September 8, 2020, Mr. White was contacted by Special Agent Susan Murphy of the United States Department of Labor ("DOL"), who told Mr. White that she was interested in speaking with him regarding the 6/10 Project.  Mr. White agreed to speak with Special Agent Murphy at a meeting on September 15, 2020.

66.     On or about September 11, 2020, RIDEM Detective Shelia Paquette contacted Mr. White to ask if he would agree to an interview.  Mr. White agreed, and on September 12, 2020, Mr. White met with Detective Paquette and voluntarily provided her with all of the information known to him about Defendants' fraud, alleged above.

Also present at the September 12, 2020 interview was RISP Detective Sargent Robert Richardson, who "shadowed" the interview.

67.    On or about September 12, 2020, RIDOT took samples of soils brought to the 6/10 Project site for testing.  At the direction of Mr. White, Mr. Rogers from the Union attended RIDOT's sampling of soils at the 6/10 Project site, and directed RIDOT representatives to the two piles of unmixed Orient Heights Soils and Pawtucket Project soils at the site.  But RIDOT refused to take samples from those piles and instead insisted on sampling soils that had already been mixed with 6/10 Project soils.  RIDOT thus deliberately tested soils that had already been mixed with soils from the 6/10 Project site, ensuring that the testing results would not accurately show the levels of contamination in the Forest Hills Soils and Pawtucket Project soils brought to the 6/10 Project site.  But despite RIDOT testing these mixed (or diluted) soils, the test results still showed that even the mixed soils contained contamination at levels in excess of what was allowed under the 6/10 Contract and applicable RIDEM permits.

68.    On September 15, 2020, Mr. White met with Special Agent Murphy of DOL, along with Criminal Investigator Todd Collins of the United States Department of Transportation ("USDOT").  Mr. Rogers of the Union was also present during this meeting.  During the meeting, Mr. White voluntarily disclosed all of the information known to him regarding Defendants' fraud.

69.    On October 1, 2020, Mr. White received a subpoena from the United States Attorney's Office for the District of Rhode Island ("USAO").  The subpoena sought records and other materials and information regarding Defendants' fraud.  On October

15, 2020, Mr. White timely complied with the subpoena and voluntarily provided the USAO with all responsive documents and other materials in his possession.

70.    Defendants, in committing the acts alleged herein, acted in bad faith, and their alleged conduct was so willful, reckless, and wicked, that it rose to the level of criminality and, in these circumstances, it must be punished.

71.    On information and belief, none of the information regarding Defendants' fraud that Mr. White provided to RIDEM, RIDOT, RISP, USDOT, and USAO, was known to them prior to Mr. White voluntarily disclosing that information to them, and they were unaware of Defendants' fraudulent scheme prior to Mr. White's voluntary disclosures.

72.    The United States government provided significant federal funds to the State of Rhode Island for use at both the 6/10 Project and the Pawtucket Project. Those federal funds, as well as funds of the State of Rhode Island, were used to pay the invoices and other claims for the work Defendants performed on those projects, including the work alleged above.

### Count I:  False or Fraudulent Claims Under the Federal FCA
(31 U.S.C. § 3729(a)(1)(A))

73.    Plaintiff United States repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

74.    From at least July 22, 2020 through August 2020, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to RIDOT for approval and payment.

75.     As to the Pawtucket Project, Barletta Heavy knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the removal and disposal of contaminated soils at a licensed disposal facility, despite knowing that those contaminated soils were instead brought to the 6/10 Project for use in the 6/10 Project.

76.     As to the 6/10 Project, Defendants knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the importation and use of soils at the 6/10 Project that were sufficiently free of contamination under the 6/10 Contract and applicable permits issued by RIDEM, despite knowing that they instead imported and used contaminated soils that contained contamination exceeding the RDEC and requirements of the 6/10 Contract and applicable RIDEM permits.

77.     Further as to the 6/10 Project, Defendants knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the importation Orient Heights Soils, despite knowing that they were providing Forest Hills Soils to the 6/10 Project.

78.     The false statements in the false or fraudulent claims for payment or approval that Defendants submitted or caused to be submitted to RIDOT for both the Pawtucket Project and the 6/10 Project were material to RIDOT's decision on whether to pay or approve the false or fraudulent claims.

79.     At the time Defendants submitted, or caused to be submitted the false or fraudulent claims for payment or approval, Defendants knew the claims were false or fraudulent, or acted with reckless disregard or deliberate ignorance of the truth of the

information in the false or fraudulent claims.

80.     On information and belief, the United States was not aware that Defendants' claims for payment were false or fraudulent at the time Defendants submitted the false or fraudulent claims, and the United States, had it known, would not have consented to payment based on Defendants' false or fraudulent claims.

81.     By virtue of the false or fraudulent claims Defendants knowingly presented, or caused to be presented to RIDOT, the United States has suffered actual damages and is entitled to recover treble damages, a civil monetary penalty for each false or fraudulent claim, attorney fees, and costs.

### Count II:  False Statements Under the Federal FCA
(31 U.S.C. § 3729(a)(1)(B))

82.     Plaintiff United States repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

83.     From at least July 22, 2020 through August 2020, Defendants knowingly made, used, or caused to be made or used false records or statements, including falsely representing where soils brought to the 6/10 Project had originated, falsely reporting soil contamination testing results for soils other than those brought to the 6/10 Project, and falsely stating that contaminated soils at the Pawtucket Project were disposed of at a licensed facility.

84.     The false or fraudulent statements contained in these false records or statements were material.

85.     Defendants knew that the information in the false records or statements

was false, or acted with reckless disregard or deliberate ignorance of the truth of the information in the false records or statements.

86.     On information and belief, the United States was not aware that Defendants' records or statements were false or fraudulent, and the United States, had it known, would not have consented to payment based on Defendants' false or fraudulent records or statements.

87.     By virtue of the false or fraudulent records or statements made, used, or caused to be made or used, the United States has suffered actual damages and is entitled to recover treble damages, a civil money penalty for each false record or statement, attorney fees, and costs.

### Count III:  Conspiracy to Violate the Federal FCA
(31 U.S.C. § 3729(a)(1)(C))

88.     Plaintiff United States repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

89.     On information and belief, two or more of the Defendants knowingly coordinated and conspired to violate the Federal False Claims Act as alleged in Counts I and II, above.

90.     By virtue of Defendants' conspiracy, the United States has suffered actual damages and is entitled to recover treble damages, a civil monetary penalty for each claim, attorney fees, and costs.

### Count IV:  False or Fraudulent Claims Under the RI FCA
(R.I. Gen. Laws § 9-1.1-3(a)(1))

91.     Plaintiff State of Rhode Island repeats and realleges each allegation in the

proceeding paragraphs as if fully set forth herein.

92.    From at least July 22, 2020 through August 2020, Defendants knowingly submitted, or caused to be submitted to RIDOT false or fraudulent claims for payment or approval.

93.    As to the Pawtucket Project, Barletta Heavy knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the removal and disposal of contaminated soils at a licensed disposal facility, despite knowing that those contaminated soils were instead brought to the 6/10 Project for use in the 6/10 Project.

94.    As to the 6/10 Project, Defendants knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the importation and use of soils at the 6/10 Project that were sufficiently free of contamination under the 6/10 Contract and applicable permits issued by RIDEM which, among other things, require that soils brought to and used at the 6/10 Project not contain contamination in excess of RIDEM's RDEC.  Defendants did so despite knowing that they instead imported and used contaminated soils that contained contamination exceeding the RDEC.

95.    Further as to the 6/10 Project, Defendants knowingly submitted, or caused to be submitted false or fraudulent claims for payment or approval for the importation Orient Heights Soils, despite knowing that they were providing Forest Hills Soils to the 6/10 Project.

96.    The false statements in the false or fraudulent claims for payment or

approval that Defendants submitted or caused to be submitted to RIDOT for both the Pawtucket Project and the 6/10 Project were material to RIDOT's decision on whether to pay or approve the false or fraudulent claims.

97.     At the time Defendants submitted, or caused to be submitted the false or fraudulent claims for payment or approval, Defendants knew the claims were false or fraudulent, or acted with reckless disregard or deliberate ignorance of the truth of the information in the false or fraudulent claims.

98.     On information and belief, the State of Rhode Island was not aware that Defendants' claims for payment were false or fraudulent at the time Defendants submitted the false or fraudulent claims, and the State of Rhode Island, had it known, would not have consented to payment based on Defendants' false or fraudulent claims.

99.     By virtue of the false or fraudulent claims Defendants knowingly caused to be presented to RIDOT, the State of Rhode Island has suffered actual damages and is entitled to recover treble damages, a civil monetary penalty for each claim, attorney fees, and costs.

**Count V:  False Statements Under the RI FCA**
(R.I. Gen. Laws § 9-1.1-3(a)(2))

100.     Plaintiff State of Rhode Island repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

101.     From at least July 22, 2020 through August 2020, Defendants knowingly made, used, or caused to be made or used false records or statements, including falsely representing where soils brought to the 6/10 Project had originated, falsely reporting

soil contamination testing results for soils other than those brought to the 6/10 Project, and falsely stating that contaminated soils at the Pawtucket Project were disposed of at a licensed facility.

102.    The false or fraudulent statements contained in these false records or statements were material.

103.    Defendants knew that the information in the false records or statements was false, or acted with reckless disregard or deliberate ignorance of the truth of the information in the false records or statements.

104.    On information and belief, the State of Rhode Island was not aware that Defendants' records or statements were false or fraudulent, and the State of Rhode Island, had it known, would not have consented to payment based on Defendants' false or fraudulent records or statements.

105.    By virtue of the false records or statements made, used, or caused to be made or used, the State of Rhode Island has suffered actual damages and is entitled to recover treble damages, a civil money penalty for each false record or statement, attorney fees, and costs.

### Count VI:  Conspiracy to Violate the RI FCA
(R.I. Gen. Laws § 9-1.1-3(a)(3))

106.    Plaintiff State of Rhode Island repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

107.    On information and belief, two or more of the Defendants knowingly coordinated and conspired to violate the RI False Claims Act as alleged in Counts IV

and V, above.

108.    By virtue of Defendants' conspiracy, the State of Rhode Island has suffered actual damages and is entitled to recover treble damages, a civil monetary penalty for each claim, attorney fees, and costs.

### Count VII:  Unjust Enrichment
(Common Law)

109.    Plaintiffs United States and State of Rhode Island repeat and reallege each allegation in the proceeding paragraphs as if fully set forth herein.

110.    From at least July 22, 2020 through August 2020, Defendants engaged in a fraudulent scheme whereby they presented to RIDOT, or caused to be presented to RIDOT false or fraudulent claims for payment as well as false or fraudulent records or statements.

111.    As a direct and proximate result of Defendants' conduct, on information and belief, RIDOT paid one or more of those false or fraudulent claims for payment, based in whole or in part on the false or fraudulent claims, records, and/or statements.

112.    Had Defendants not submitted false and fraudulent claims, records, and/or statements to RIDOT, RIDOT would not have paid Defendants' claims. Defendants are not entitled to those payments.

113.    In the circumstances, it would be patently unjust and inequitable to allow Defendants to retain the funds paid by RIDOT in response to Defendants' false or fraudulent claims, records, or statements.

114.    As a direct and proximate result of the conduct alleged above, Plaintiffs

the United States and the State of Rhode Island have suffered actual damages in an amount to be determined at trial.

### Count VIII:  Conversion of Property of the United States
(Common Law)

115.    Plaintiff United States repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

116.    From at least July 22, 2020 through August 2020, by virtue of the acts described above, Defendants have appropriated property of the United States for their own use and benefit, and have exercised dominion over such property in defiance of the United States' rights.

117.    Defendants are therefore liable to the United States for actual damages in an amount to be determined at trial.

### Count IX:  Conversion of Property of the State of Rhode Island
(Common Law)

118.    Plaintiff the State of Rhode Island repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

119.    From at least July 22, 2020 through August 2020, by virtue of the acts described above, Defendants have appropriated property of the State of Rhode Island for their own use and benefit, and have exercised dominion over such property in defiance of the State of Rhode Island's rights.

120.    Defendants are therefore liable to the State of Rhode Island for actual damages in an amount to be determined at trial.

<u>**Count X: Violation of Rhode Island Hazardous Waste Management Act**</u>
(R.I. Gen. Laws § 23-19.1-22)

121.    Plaintiff the State of Rhode Island repeats and realleges each allegation in the proceeding paragraphs as if fully set forth herein.

122.    From at least July 22, 2020 through August 2020, Defendants engaged in the transportation, storage, or disposal of hazardous waste without authorization from RIDEM.

123.    In doing so, Defendants violated the Rhode Island Hazardous Waste Management Act, R.I. Gen. Laws §§ 23-19.1-1 *et seq.*, including without limitation R.I. Gen. Laws § 23-19.1-22.

124.    As a direct and proximate result of Defendants' conduct, the State of Rhode Island has suffered damages, and is entitled to recovery those damages, as well as any applicable statutory fines or penalties, from Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Relator James White and Plaintiffs respectfully request that the Court enter judgment as follows:

1.    On Counts I-III under the Federal FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with and award of attorney fees, costs, and such further relief as may be just and proper.

2.    On Counts IV-VI under the RI FCA, for the amount of the State of Rhode

Island's damages, trebled as required by law, and such civil penalties as are required by law, together with and award of attorney fees and costs, and such further relief as may be just and proper.

3.     On Count VII, for unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or amounts which Defendants retained from payments by RIDOT (comprised of funds of the United States and the State of Rhode Island) to which they were not entitled, plus interest, costs, expenses, and punitive damages.

4.     On Count VIII, for conversion of property of the United States, for the damages sustained by the United States in an amount to be determined at trial, plus interest, costs, expenses, and punitive damages.

5.     On Count IX, for conversion of property of the State of Rhode Island, for the damages sustained by the State of Rhode Island in an amount to be determined at trial, plus interest, costs, expenses, and punitive damages.

6.     On Count X, for violation of the Rhode Island Hazardous Waste Management Act, for damages sustained by the State of Rhode Island in an amount to be determined at trial, plus statutory fines or penalties, interest, costs, and expenses.

7.     All other relief as may be authorized by law and in the interests of justice.

**Relator James White demands a jury trial on all issues so triable.**

*Signature page follows.*

Respectfully submitted,

*/s/ Christopher N. Dawson*

Robert Clark Corrente (#2632)
Joseph D. Whelan (# 5694)
Christopher N. Dawson (# 8508)
**WHELAN CORRENTE & FLANDERS LLP**
100 Westminster Street, Suite 710
Providence, RI 02903
Tel:  (401) 270-4500
Fax: (401) 270-3760
rcorrente@whelancorrente.com
jwhelan@whelancorrente.com
cdawson@whelancorrente.com

Dated:  January 15, 2021

**00053252v2.DOCX**